**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

MICHELLE A.,

                   Plaintiff,

vs.

KILOLO KIJAKAZI,
Acting Commissioner of Social
Security,

               Defendant.

No. 6:22-CV-02017-LRR

**ORDER**

---

**I.**       *INTRODUCTION* ............................................................................ *2*

**II.**     *RELEVANT PROCEDURAL BACKGROUND* ..................................... *2*

**III.**    *ALJ's FINDINGS* ............................................................................ *3*

**IV.**    *STANDARD OF REVIEW* ................................................................. *5*

**V.**     *RELEVANT FACTUAL BACKGROUND* ............................................ *6*

**VI.**    *ANALYSIS* ...................................................................................... *7*

    *1.*    *Whether the ALJ Articulated Sufficient Reasons to Find the Opinions of the ARNP Katie Bries Unpersuasive* .................................................................... *7*

    *2.*    *Whether the ALJ Properly Considered Plaintiff's Subjective Complaints of Pain* .......................................................................................................... *12*

    *3.*    *Whether The ALJ Erred by Not Fully and Fairly Developing the Record Regarding Plaintiff's Physical and Mental Limitations* ................................ *14*

    *4.*    *Whether the ALJ that Decided Plaintiff's Claim was Constitutionally Appointed by Acting Commissioner Berryhill During Berryhill's Second Term as Acting Commissioner* ................................................................................... *18*

**VII.**   *CONCLUSION* .............................................................................. *33*

# I. INTRODUCTION

The matter before the court is the Complaint (docket no. 3) filed by Plaintiff Michelle A. ("Plaintiff"), requesting judicial review of the Social Security Commissioner's ("Commissioner") decision to deny her application for Title II disability insurance benefits ("DIB") under 42 U.S.C. Sections 401-434 and Title XVI supplemental security income ("SSI") under 42 U.S.C. Sections 1381-1385. Plaintiff asks that the court reverse the decision of the Commissioner and order the Commissioner to provide her disability insurance and/or supplemental security income benefits. In the alternative, Plaintiff asks that the court remand this matter for further proceedings.

# II. RELEVANT PROCEDURAL BACKGROUND

On August 27, 2019, Plaintiff protectively filed an application for DIB and on November 19, 2019, filed an application for SSI, with both alleging disability due to stroke, memory loss, high blood pressure and anxiety. Administrative Record ("R") at 203, 205, 254. Plaintiff claims that she became disabled on June 7, 2019. *Id.* at 254. Her applications were denied upon initial review and on reconsideration. *Id.* at 136, 141, 147, 150. On December 3, 2020, Plaintiff appeared with her attorney for a hearing before Administrative Law Judge John E. Sandbothe ("ALJ"). *Id.* at 76-93. In a decision dated December 24, 2020, the ALJ denied Plaintiff's claims. *Id.* at 56-75. On January 19, 2021, Plaintiff appealed the ALJ's decision, and the Appeals Council denied review on February 24, 2022. *Id.* at 1-7, 197.

On April 21, Plaintiff filed the instant action for judicial review. *See* docket no. 1. A briefing schedule was entered on July 8, 2022. *See* docket no. 9. An order issued on October 7, 2022, modified the briefing schedule. *See* docket no. 13. On October 28, 2022, Plaintiff filed the Plaintiff's Brief ("Plaintiff's Brief") (docket no. 15). On November 25, 2022, the Commissioner filed the Defendant's Brief ("Commissioner's Brief") (docket no. 17). On December 6, 2022, Plaintiff filed the Reply Brief (docket

2

no. 18). Additionally, on October 20, 2022, the parties filed the Joint Statement of Facts (docket no. 14). The matter is fully submitted and ready for decision.

## III. *ALJ's FINDINGS*

The ALJ determined that Plaintiff was not entitled to disability insurance benefits or supplemental security income benefits because she was functionally capable of performing work available in the general economy. R at 69. In making this determination, the ALJ followed the five-step sequential process required by the social security regulations for assessing whether a claimant is under a disability. *See* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019); *Moore v. Colvin*, 769 F.3d 987, 988 (8th Cir. 2014). The five steps an ALJ must consider are 1) whether the claimant is currently employed; (2) whether the claimant is severely impaired; (3) whether the impairment is or approximates an impairment listed in Appendix 1; (4) whether the claimant can perform past relevant work; and, if not, (5) whether the claimant can perform any other kind of work. *Id.*; *see also* 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006).

In considering the steps in the five-step process, the ALJ:

first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

3

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009)). If the claimant is unable to return to his relevant past work, then, at step five, the burden shifts to the Commissioner to demonstrate that "the claimant has the physical residual functional capacity [("RFC")] to perform a significant number of other jobs in the national economy that are consistent with [his or] her impairments and vocational factors such as age, education, and work experience." *Phillips v. Astrue*, 671 F.3d 699, 702 (8th Cir. 2012) (quoting *Holley v. Massanari*, 253 F.3d 1088, 1093 (8th Cir. 2001)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.925(a); *Toland v. Colvin*, 761 F.3d 931, 935 (8th Cir. 2014). The ALJ bears the responsibility for determining "a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or] her limitations." *Myers v Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); *see also* 20 C.F.R. §§ 404.1545, 416.945.

In the case at bar, the ALJ determined that Plaintiff met the insured status requirements through December 31, 2024. R at 61. The ALJ then applied the first step of the analysis and determined that Plaintiff had not engaged in substantial gainful activity from her alleged disability onset date of June 7, 2019. *Id*. At the second step, the ALJ concluded from the medical evidence that, through the date last insured, Plaintiff had the following severe impairments: [residual neurological effects of] cerebrovascular accident, neurocognitive disorder, anxiety, depression and posttraumatic stress disorder (PTSD). *Id*. At the third step, the ALJ found that, through the date last insured, Plaintiff did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id*. at 62. At the fourth step, the ALJ determined that, through the date last

4

insured, Plaintiff had the capacity to perform less than the full range of light work, specifically finding:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift and carry 20 pounds occasionally and 10 pounds frequently. She can be on her feet for 6 hours total during the workday. She can occasionally balance, stoop, kneel, crouch, and crawl. She should do no climbing, have no exposure to hazards and do no driving. She would be limited to simple, routine work, superficial interaction with the public, and no fast-paced work.

*Id*. at 63. Also at the fourth step, the ALJ determined that, through the date last insured, Plaintiff was not able to perform her past relevant work as a Medical Coder. *Id*. at 68. At the fifth step, the ALJ determined that Plaintiff was capable of performing jobs available in the national economy as a cleaner, an office helper and a bagger. *Id*. at 68-69. Therefore, the ALJ concluded that Plaintiff was not disabled. *Id*. at 69.

## IV.  STANDARD OF REVIEW

The Commissioner's final determination not to award disability insurance benefits is subject to judicial review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The court has the power to "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner. . . with or without remanding the cause for a rehearing." *Id*. The Commissioner's factual findings shall be conclusive "if supported by substantial evidence." *Id*. An ALJ's decision must be affirmed "if it is supported by substantial evidence in the record as a whole." *Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021) (quoting *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'" *Kraus v. Saul*, 988 F.3d 1019, 1024 (8th Cir. 2021) (quoting *Phillips*, 671 F.3d at 702).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the [administrative law judge ("ALJ")], but [it] do[es] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th

5

Cir. 2005). The court considers "both evidence that detracts from the Commissioner's decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (providing that review of the Commissioner's decision "extends beyond examining the record to find substantial evidence in support of the [Commissioner's] decision" and noting that the court must also "consider evidence in the record that fairly detracts from that decision"). The Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is "something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal."

*Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991)). A court "will disturb the ALJ's decision only if it falls outside the available zone of choice." *Kraus*, 988 F.3d at 1024 (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)). "An ALJ's decision is 'not outside the zone of choice' simply because [the c]ourt 'might have reached a different conclusion had [it] been the initial finder of fact.'" *Kraus*, 988 F.3d at 1024 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the [Commissioner's] decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *see also Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (providing that a court "may not reverse simply because [it] would have reached a different conclusion than the [Commissioner] or because substantial evidence supports a contrary conclusion").

## V. RELEVANT FACTUAL BACKGROUND

The parties filed the Joint Statement of Facts (docket no. 14), which addresses Plaintiff's background, the case's procedural history, testimony from the administrative

hearings, and Plaintiff's medical history. The Joint Statement of Facts is hereby incorporated by reference. Further discussion of pertinent facts will be addressed, as necessary, in the court's consideration of the legal issues presented.

Plaintiff was born in 1970. R at 242. She completed high school and then completed vocational training to be a Medical Coder. *Id*. at 255. In the past she has worked as a medical billing coder for an ophthalmologist and for a dermatology office. *Id*.

## VI.   ANALYSIS

### 1.   *Whether the ALJ Articulated Sufficient Reasons to Find the Opinions of the ARNP Katie Bries Unpersuasive*

#### a.  *The Parties' Arguments*

Plaintiff alleges that the ALJ erred in finding that the opinions of the treating source, ARNP Katie Bries, were unpersuasive. *See* Plaintiff's Brief at 4-7. Plaintiff argues further that the ALJ erred because he thought that a light exertional level accounted for the lifting limitations to which ARNP Bries opined but that those limitations limit her to sedentary work rather than light work. *Id*. at 7. Plaintiff also seems to allege that the ALJ intended to account for Plaintiff's subjective fear that lifting heavy objects would cause a stroke but failed to do so and that he mistakenly "overlooked" that ARNP Bries also opined Plaintiff should only lift ten pounds occasionally. *Id*.

The Commissioner counter-argues that the ALJ properly considered ARNP Bries's opinions. *See* Commissioner's Brief at 5-6. In support of her argument, the Commissioner argues further that ARNP Bries opined that Plaintiff could lift up to ten pounds and that the difference between less than ten and ten is negligible, thereby rendering any error non-prejudicial. *Id*. Additionally, the Commissioner asserts that Plaintiff's own testimony supports that her true lifting limitation is twenty pounds. *Id*.

In her reply brief, Plaintiff clarifies that the alleged error is that the ALJ overlooked the ten-pound lifting limitation. *See* Reply Brief at 2-3. Additionally,

7

Plaintiff argues that the question of whether the difference between lifting "less than ten pounds" and lifting "ten pounds" is negligible is a question which requires vocational expert testimony. *Id.* at 3.

### b. Applicable Law

The standard for evaluating medical opinion evidence for cases filed after March 27, 2017, is articulated in 20 C.F.R. §§ 404.1520c, 416.920c. Under these rules, an ALJ is no longer obligated to follow the "Treating Physician Rule" or otherwise provide "good reasons" for failing to do so. *See* 20 C.F.R. §§ 404.1520c, 416.920c. Also under the current rules, no medical opinion is automatically given controlling weight but instead is considered based on the persuasiveness of the opinion. *See* 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Opinions from medical sources are evaluated using the following factors: (1) supportability; (2) consistency; (3) provider's relationship with the claimant; (4) specialization; and (5) other factors. *See* 20 C.F.R. § 404.1520c(c), 416.920c(c).

Supportability and consistency are the most important factors when determining "how persuasive the ALJ find[s] a medical source's medical opinions . . . to be." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). The ALJ "may, but [is] not required to, explain how [he or she] considered the factors in paragraphs (c)(3) through (c)(5)." *Id.* An opinion is more persuasive if it is consistent with and supported by the medical evidence as a whole. *See* 20 C.F.R. §§ 404.1520c(c)(1-2), 416.920c(c)(1-2).

Supportability concerns the internal consistency a source's opinion has with the source's own findings and notes. "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

Consistency concerns the external consistency the source's opinion has with the findings and opinions of other sources. "The more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the

8

more persuasive the medical opinion . . . will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

In considering the consistency of a medical opinion with the record as a whole, an ALJ may consider a claimant's daily activities. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

### c. *Application and Discussion*

On December 16, 2019, ARNP Bries completed a "Treating Source Statement – Stroke Residual Functional Capacity Questionnaire."[1] R at 531-536. ARNP Bries stated that she had treated Plaintiff since June 26, 2019. *Id*. at 532. ARNP Bries stated that Plaintiff was diagnosed with an intraparenchymal hemorrhage of the brain and depression and was in fair, stable condition. *Id*. ARNP Bries stated that reported symptoms included balance problems, loss of manual dexterity, right foot weakness, unstable walking at night, falling spells, fatigue, vertigo, headaches, difficulty remembering, depression, emotional lability, difficulty with problem solving and speech/communication difficulties. *Id*. ARNP Bries opined that Plaintiff was not a malingerer, that emotional factors contributed to Plaintiff's limitations, that Plaintiff's impairments were reasonably consistent with the functional limitations she described, and that Plaintiff's symptoms would often be severe enough to interfere with attention and concentration. *Id*. at 533. ARNP Bries opined that Plaintiff could walk 3 blocks, did not need to use a cane to stand or walk, could frequently lift less than ten pounds, could occasionally lift ten and twenty pounds, and had no manipulative limitations. *Id*. at 533-534. ARNP Bries opined that Plaintiff could occasionally twist, stoop and bend, could rarely crouch and could never climb ladders or stairs. *Id*. at 534. ARNP Bries opined that Plaintiff should avoid concentrated exposure to extreme heat and cold; high humidity; fumes, odors, dust and gases; and perfumes. *Id*. at 535. ARNP Bries opined that Plaintiff

---

[1] On the same day, ARNP Bries also completed a "Treating Source Statement – Mental Residual Functional Capacity Questionnaire" which is not relevant to the issue at bar.

should avoid all exposure to smoke, soldering fluxes, solvents and cleaners, chemicals, irritants and allergens and bright or blue lights. *Id*. at 535. ARNP Bries opined that Plaintiff would have good days and bad days and would be absent more than four days per month. *Id*. at 535. ARNP Bries opined that Plaintiff could not comprehend written materials, suffered from depression, suffered significant memory loss and suffered some loss of vision. *Id*. at 536.

In the decision, the ALJ thoroughly considered ARNP Bries's opinions. *Id*. at 65-66. The ALJ found that the limitation to lifting 20 pounds occasionally, as well as the opinion that Plaintiff could rarely crouch or crawl, were found persuasive. *Id*. at 65. The ALJ went on to find however that he was "unable to attribute much persuasiveness to other opinions." *Id*. The ALJ reasoned that there was no determinable breathing impairment which would warrant the limitations to odors, funds, dusts and gases. *Id*. Additionally, the ALJ reasoned that ARNP Bries appeared to have relied upon complete acceptance of Plaintiff's subjective complaints.

The ALJ further reasoned:

The opinions are inconsistent with other evidence and inconsistencies in the record as a whole which the treating nurse practitioner does not appear to have been aware of, and the limitations are not reflective of the claimant's functioning for the time period 12 months after her alleged onset date. For example, by April 2020 there were no balance problems complained of, no findings of loss of manual dexterity or weakness alleged or found, and no speech/communication difficulties ("Fluent speech") (Exhibit 10F).

*Id*. at 66.

On its face, the ALJ's consideration of ARNP Bries opinion articulates sufficient reasoning for his consideration of her opinions. The ALJ articulated that the environmental limitations set forth were in contradiction to ARNP Bries's own notes and the medical record in general. *Id*. at 65. He further articulated that ARNP Bries rendered her opinion approximately six months after Plaintiff's alleged onset date and that later evidence showed an improvement in Plaintiff's condition which was not known at the time ARNP Bries rendered her opinions. *Id*. at 66. This is of special significance because

the onset of Plaintiff's condition was caused by an acute medical episode during which she suffered a stroke. Because the Act requires that any disability be required to last or be expected to last for a period of no less than twelve months, the ALJ properly considered whether the functional impairments caused by the medical condition would have persisted for twelve months or whether Plaintiff's condition improved before a period of disability could be established.

Additionally, Plaintiff errs in her assertions that the ALJ did not address ARNP Bries's opinion that Plaintiff could occasionally lift ten pounds and frequently lift up to ten pounds. *See* Plaintiff's brief at 5-6. Plaintiff clarifies in her reply brief that she is alleging that the ALJ overlooked ARNP Bries's opinion that Plaintiff could only lift ten pounds occasionally and did not realize that restriction was opined to by ARNP Bries. *See* Reply brief at 2. The record does not support Plaintiff's argument. It does not appear from the language of the ALJ's decision that there was any "oversight" on the ALJ's part that ARNP Bries stated Plaintiff could occasionally lift ten pounds. Rather, the language in the decision indicates the ALJ considered ARNP Bries's opinion that Plaintiff could occasionally lift ten pounds and found it unpersuasive.

In the decision, the ALJ stated "[t]he findings as to limitations of lifting 20 pounds occasionally as well as stooping and crouching occasionally are supported, are consistent with other evidence and have been given a good deal of persuasiveness." *Id*. at 65. The ALJ then stated that he could not attribute much persuasiveness to ARNP Bries's other opinions. *Id*. The ALJ did not refer to ARNP Bries's opinions as to lifting in general, nor did he make any erroneous reference to a lifting restriction of ten pounds frequently. Instead, he specifically referenced ARNP Bries's opinion that Plaintiff could lift up to twenty pounds occasionally and found it persuasive and then went on to find all other opinions unpersuasive. *Id*.

Having reviewed the record as a whole, the court concludes that the ALJ considered ARNP Bries's opinions and articulated good reasons for affording some of

11

them persuasiveness while finding others unpersuasive.  Accordingly, the court declines to remand as to this issue.

### 2.    Whether the ALJ Properly Considered Plaintiff's Subjective Complaints of Pain

#### a.  Parties' Arguments

Plaintiff argues that the ALJ erred by rejecting her subjective complaints regarding her cognitive and mental  limitations without articulating good reason.  *See* Plaintiff's Brief at 8-10.  Additionally, Plaintiff alleges the only factor which the ALJ meaningfully addressed which was not favorable to Plaintiff was medication effectiveness, because Plaintiff's work history favored her credibility.  *Id*. at 9.

The Commissioner asserts that the ALJ properly considered Plaintiff's subjective complaints and that the ALJ noted "that the objective medical evidence and daily activities did not support Plaintiff's allegations of total disability."  *See* Commissioner's brief at 7.

#### b. Applicable Law

It is the claimant's burden to prove her functional limitations, not the ALJ's burden to prove the claimant's functional capabilities.  *See Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)); *accord Charles v. Barnhart*, 375 F.3d 777, 782 (8th Cir. 2004).  *See*, *e.g.*, *Qualls v. Apfel* 158 F.3d 425, 428 (8th Cir. 1998) (finding doing crafts, raising flowers, driving, cooking, cleaning, doing laundry, and shopping are activities consistent with light work).

The assessment of a claimant's credibility is a factor used in the determination of a claimant's residual functional capacity to perform work.  An ALJ must consider the following factors when evaluating a claimant's credibility: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective

12

medical evidence to support the claimant's complaints. *Buckner v. Astrue,* 646 F.3d 549, 558 (8th Cir. 2011) (otherwise known as the *Polaski* factors from *Polaski v. Heckler,* 739 F.2d 1320, 1321–22 (8th Cir. 1984)).

The "credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Moore v. Astrue,* 572 F.3d 520, 524 (8th Cir. 2009). Consequently, courts should defer to the ALJ's credibility finding when the ALJ explicitly discredits a claimant's testimony and gives good reason to do so. *Buckner,* 646 F.3d at 558. Although an ALJ need not explicitly discuss each *Polaski* factor in his or her decision, he or she must at least acknowledge and consider the factors. *See Renstrom v. Astrue,* 680 F.3d 1057, 1067 (8th Cir. 2012) ("The ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledged and examined those considerations before discounting a claimant's subjective complaints"). Thus, while the ALJ may not simply reject a claimant's testimony out of hand, the ALJ is not obliged to simply accept testimony as credible without consideration as to the consistency of that testimony with the record as a whole.

### c. Application and Discussion

Initially, the court notes that Plaintiff has misinterpreted the ALJ's language with regard to Plaintiff's work history. The ALJ noted that Plaintiff had a "modest" or "fair" work history but that it would still weigh in Plaintiff's favor. R at 68. He went on to state that factors in Plaintiff's favor "are outweighed by other evidence and inconsistencies in the record." *Id*. A "fair" work record is not a factor which by itself may serve as a basis for finding an individual credible, but rather must be considered as part of the record. In this instance it was considered as part of the record as a whole.

Moreover, despite Plaintiff's assertions that the ALJ did not consider the effects of her cognitive and mental impairments and did not meaningfully address any factor but medication management, this is not supported by the record. The ALJ meaningfully addressed the objective medical findings, as well as Plaintiff's statements to providers regarding her activities of daily living. For instance, the ALJ noted that despite the fact

13

that Plaintiff alleges she has a visual defect, she has continued to drive and on examination routinely is shown to have 20/20 vision. *Id.* at 66.

The ALJ considered that Plaintiff suffered a neurovascular accident in June of 2019, but that by April 2020 showed no mental status changes, no motor weakness, fluent speech, normal affect and no obvious cognitive defects in memory or recognition. *Id.* The ALJ considered that on October 8, 2020, Plaintiff underwent a neuropsychological examination and was noted to be independent with all basic activities of daily living, and had the ability to follow a simple recipe and cook simple meals. *Id.* at 67. The ALJ also considered that when reviewing Plaintiff's record, the state agency medical consultant noted that Plaintiff's activities of daily living and the objective medical evidence were inconsistent with her allegations of disability. *Id.* The ALJ further considered that medications were generally effective in treating Plaintiff's symptoms and that no side effects were shown which lasted for more than 12 months. *Id.*

Having reviewed the record, the court finds that the ALJ did not fail to meaningfully address all of the factors necessary but instead sufficiently addressed all of the factors necessary under *Polaski*. While the ALJ did consider several factors in Plaintiff's favor, he sufficiently articulated that those factors were outweighed by other factors such as the objective medical records and Plaintiff's activities of daily living. Accordingly, the court declines to remand as to this issue.

### 3. Whether The ALJ Erred by Not Fully and Fairly Developing the Record Regarding Plaintiff's Physical and Mental Limitations

#### a. The Parties' Arguments

Plaintiff argues that the ALJ should have developed the record with regard to Plaintiff's physical and mental limitations. *See* Plaintiff's Brief at 11-12. Specifically, Plaintiff argues that post-hearing neurology records from Dr. Sangeeta Singh show that Dr. Singh diagnosed Plaintiff with additional neurology-related limitations including

migraine headaches. *Id.* at 12. Plaintiff argues that this new evidence after hearing warrants remand. *Id.*

The Commissioner counter-argues that the ALJ was not under an obligation to further develop the record because the record contained sufficient evidence from which to make a decision. *See* Commissioner's Brief at 9-10. The Commissioner further argues that the Appeals Council properly held that Dr. Singh's medical records from September of 2021 through January of 2022, did not relate to the adjudicated period which ended in December of 2020. *Id.* at 10.

### b. *Applicable Law*

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience. *See Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). "An ALJ determines a claimant's RFC 'based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" *Koch v. Kijakazi*, 4 F.4th 656, 667 (8th Cir. 2021) (alteration in original) (quoting *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017)). Thus, an ALJ must use "'some medical evidence of the claimant's ability to function in the workplace' in order to make a proper RFC assessment; "[t]he ALJ may not simply draw his [or her] own inferences about [the claimant's] functional ability from medical reports." *Id.* (first and third alterations in original) (quoting *Combs*, 878 F.3d at 646); *see also Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008) ("Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace.").

An ALJ "has a duty to fully and fairly develop the evidentiary record." *Byes v. Astrue*, 687 F.3d 913, 915-16 (8th Cir. 2012); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006). While an ALJ has a duty to develop the record, this duty is not never-ending. *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011). An ALJ may

15

issue a decision without obtaining additional medical evidence when other evidence in the record is adequate for the ALJ to make an informed decision. *Haley v. Massanari*, 258 F.3d 742, 749-750 (8th Cir. 2001). Moreover, "reversal for failure to develop the record is warranted only when such failure is unfair or prejudicial." *Twyford v. Comm'r Soc. Sec.*, 929 F.3d 512, 517 n.3 (8th Cir. 2019) (quotation omitted).

> The Eighth Circuit has held:
>
> Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

*Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted).

Current regulations impose upon claimants and their representatives a reciprocal duty to inform the SSA about or to submit to the SSA all known medical evidence which relates to the issue of their disability in order to assist in developing the record. "Each party must make every effort to ensure that the administrative law judge receives all of the evidence and must inform us about or submit any written evidence, as required in 20 C.F.R. § 404.1512, no later than 5 business days before the date of the scheduled hearing" (the "Five-Day Rule"). 20 C.F.R. § 404.935(a). If a claimant fails to comply with this requirement, the ALJ "may decline to consider or obtain the evidence," 20 C.F.R. § 404.935(a), unless the claimant: (1) was misled by an action taken by the Social Security Administration; (2) had physical, mental, or linguistic limitations that prevented her from submitting the evidence earlier; or (3) was prevented from submitting the evidence earlier by "[s]ome other unusual, unexpected, or unavoidable circumstance" beyond her control." 20 C.F.R. § 404.935(b).

The Five-Day Rule gives the ALJ discretion to admit or exclude the late-submitted evidence. *Id.* ("If you do not comply with this requirement, the administrative law judge may decline to consider or obtain the evidence.…"). Accordingly, the court reviews the

16

ALJ's decision whether to allow evidence not disclosed to the ALJ at least five days prior to hearing for abuse of discretion. *See Passmore v. Astrue*, 533 F.3d 658, 665-66 (8th Cir. 2008) (where agency regulation confers discretion on the ALJ, court's review is for abuse of discretion).

### c. Application and Discussion

Plaintiff's argument that the ALJ did not develop the record with regard to Plaintiff's mental and cognitive impairments is unpersuasive. Plaintiff was evaluated by a psychologist, John Williams, Ph.D., at the request of the Commissioner on January 15, 2020. R at 542-548. Dr. Williams administered the Weschler Memory Scale-Fourth Edition. *Id*. at 542. Dr. Williams opined that Plaintiff appears capable of understanding and following instructions and procedures but might need written reminders of verbal instructions. *Id*. at 547. The ALJ considered Dr. Williams's findings and opinion and stated that he fully accounted for those findings. *Id*. at 66. Additionally, the ALJ considered the results of a neuropsychological examination performed on October 8, 2020, by Kristen Caraher, Psy.D. at the referral of Dr. Buatti. *Id*. at 66. While Dr. Caraher reported that her findings likely underrepresented Plaintiff's cognitive abilities due to her failure to fulling engage in testing, Dr. Caraher noted that Plaintiff was able to perform all basic activities of daily living independently. *Id*. at 975, 978. Given that Plaintiff underwent thorough evaluations by two separate examiners the court does not find that the ALJ erred in not sending Plaintiff for a third such examination.

With regard to Dr. Singh's records, Plaintiff's argument is wholly without merit. Here, Plaintiff argues that the ALJ erred by not developing the record as to medical evidence which did not exist at the time of the hearing. The records in question were not created until September of 2021, more than 10 months after the hearing was held and nearly ten months after the decision in the case was rendered. *Id*. at 14-44. Moreover, at no time during the hearing did Plaintiff allege that she suffered from headaches. *Id*. at 76-93. During her hearing testimony Plaintiff complained of loss of memory loss,

vision, vertigo, weakness in her right foot and testified that she was scared to lift anything heavy for fear of causing something in her head to "pop." *Id*. 81-86. Plaintiff testified that she suffered from anxiety. *Id*. at 88. She did not mention migraines or even headaches in general. *Id*. at 76-93.

Plaintiff points to no evidence which indicates that she complained of headaches prior to September of 2021. Plaintiff's own hearing testimony made no mention of headaches, as noted above. When Plaintiff was examined by consultative examiner Dr. Williams, she did not report suffering from headaches. *Id*. at 542-547. When Plaintiff underwent a neuropsychological evaluation by Dr. Caraher on October 8, 2020, it was noted by Dr. Caraher that Plaintiff reported that she had headaches at the time of her cerebrovascular incident but that they had resolved by July of 2019. *Id*. at 974-975.

The court find the ALJ did not err in not obtaining additional evidence regarding Plaintiff's alleged migraine headaches because at the time of hearing Plaintiff did not allege that she suffered from any symptoms of migraines. Thus, having reviewed the record, the court concludes that the argument is a frivolous one. Additionally, to the extent that Plaintiff seeks to use said argument as a vehicle to introduce evidence which was properly excluded, the court declines to assist Plaintiff in doing so. For this reason, the court declines to remand as to this issue.

### 4. *Whether the ALJ that Decided Plaintiff's Claim was Constitutionally Appointed by Acting Commissioner Berryhill During Berryhill's Second Term as Acting Commissioner*

#### a. The Parties' Arguments

Plaintiff argues that the ALJ who adjudicated her case had no authority to do so because she was not appointed consistent with the provisions of the Federal Vacancies Reform Act ("FVRA"). *See* Plaintiff's Brief at 12-24.

The Commissioner counter-argues that Berryhill was validly serving as Acting Commissioner when she ratified the appointments of all ALJ's hired by SSA and that the

ALJ who rendered the decision in this matter was therefore properly appointed. *See* Commissioner's Brief at 11-27.

In her reply brief, Plaintiff asserts that the legislative history of the FVRA is not clear that there was a springback provision intended and that for that reason the FVRA statutory interpretation must be decided solely on a plain text interpretation. *See* Reply Brief at 5-9.

### b. Applicable Law

Statutory interpretation "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638, (2016). It is a fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, and common meaning. *Sandifer v. U.S. Steel Corp.,* 571 U.S. 220, 220 (2014). "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985) (citing *American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)).

Courts "ordinarily resist[ ] reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)); *see also Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1900 (2019) ("[I]t is our duty to respect not only what Congress wrote but, as importantly, what it didn't write.").

The Eighth Circuit explained that:

> [T]his Court looks to canons of statutory interpretation only when the meaning of a statute is ambiguous or would lead to an illogical result that defeats the purpose of the legislation. This Court interprets statutes in a way that is not hyper-technical, but instead, is reasonable and logical and gives meaning to the statute.

*Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015).

The first approach to statutory interpretation is the "plain language" of the statute, which is the "one, cardinal cannon before all others." *Connecticut Nat'l Bank v.*

*Germain,* 503 U.S. 249, 253 (1992). Where the language of the statute is plain, the inquiry ends with the language of the statute. *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989).

The second cardinal rule of statutory construction is that when the plain text is ambiguous the intent of the legislative assembly is to be given effect. "[T]he Court interprets statutory provisions—including delegations—by reading the text in "context" and in light of the statutory purpose." *National Broadcasting Co. v. United States*, 319 U.S. 190, 214, 216 (1943). *See also Gundy v. United States*, 139 S. Ct. 2116 (2019). But statutes are "contextual as well as textual." *Argosy Ltd. v. Hennigan*, 404 F.2d 14, 20 (5th Cir. 1968). "When interpreting a statute, we must also consider the statutory context in which the words in question appear, including both '"the specific context in which th[e] language is used, and the broader context of the statute as a whole .'" *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, 9 F.4th 803, 807 (8th Cir. 2021), *cert. denied,* 142 S. Ct. 2888 (2022). Where a literal interpretation of a statutory provision would not accord with the intended purpose of the legislation, or produces an absurd result, courts must look beyond the plain words of the statute. *United States v. American Trucking Assns.*, 310 U.S. 534, 543 (1940).

Also, "[g]enerally, in the context of statutory interpretation, a word is known by the company it keeps, which is an interpretive principle called 'noscitur a sociis[.]'" *Designworks Homes, Inc.,* 9 F.4th at 803.

### c. Application and Discussion

### 1. The FVRA and Factual Background

The Appointments Clause of the U.S. Constitution requires presidentially appointed "Officers of the United States" to receive Senate confirmation. U.S. Const. art. II, § 2, cl. 2. The Clause "distinguishes between two kinds of officers." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2199 n.3 (2020). The first kind are "principal officers," commonly referred to as PAS officers who must be appointed by the President with the advice and consent of the Senate. *Id.* The second class of

officers consists of "inferior officers," who can alternatively also be appointed by the President with the advice and consent of the Senate, but "whose appointment Congress may vest in the President, courts, or heads of Departments." *Id.* at 2199 n.3. But where a vacancy arises and "the President and Senate cannot promptly agree on a replacement," the ensuing delay risks that the PAS office remains unfilled, and its official acts go "unperformed." *N.L.R.B. v. SW General, Inc.*, 137 S. Ct. 929, 934, (2017).

In 1998, Congress enacted the Federal Vacancies Reform Act of 1998 (FVRA) Pub.L. 105–277, Div. C, Title I, § 151, Oct. 21, 1998, 112 Stat. 2681–611, 5 U.S.C. § 3301 et seq. Like the earlier Vacancies Act, the FVRA includes a first-assistant default rule[2], but it permits the President to override that rule. 5 U.S.C. § 3345(a)(1).

The FVRA prescribes time limits for those serving in acting positions in 5 U.S.C. § 3346. It provides that:

(a)    Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—
    (1) for no longer than 210 days beginning on the date the vacancy occurs; or

    (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.
(b)
    (1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.
    (2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—
        (A) until the second nomination is confirmed; or

---

[2] The Vacancies Act of July 23, 1868, ch. 227, 15 Stat. 168 (1868), a predecessor to the Federal Vacancies Reform Act (FVRA) which established the basic statutory framework that continues to operate today, created a default rule that in the case of a vacancy "of the head of any executive department of the government, the first or sole assistant thereof shall . . . perform the duties of such head until a successor be appointed, or such absence or sickness shall cease." *Id.* § 1, 15 Stat. at 168.

21

> **(B)** for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

*Id*.

For vacancies existing during the first 60 days after a Presidential transition (as occurred in 2017), the 210-day period runs from the later of 90 days after inauguration or 90 days after the date of the vacancy.  5 U.S.C. § 3349a(b).

There is no dispute that the office of Commissioner of Social Security is an office subject to Presidential nomination and Senate Confirmation, otherwise known as a "PAS" position.  *See* 42 U.S.C. § 902.  Thus, the court will not address that issue.  Similarly, the court will not address whether the FVRA was the exclusive means by which Berryhill might have been appointed because neither party argues that Berryhill was appointed by the alternative statutory provision set forth in the Social Security Act.  *See* 42 U.S.C. § 902; *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 953 (D. Md. 2020), *appeal dismissed sub nom. Casa De Maryland, Inc. v. Mayorkas*, No. 20-2217 (L), 2021 WL 1923045 (4th Cir. Mar. 23, 2021).  Thus, initially, the court finds that Plaintiff is correct that Berryhill's appointment was subject to the FVRA.

Berryhill assumed the role of Acting Commissioner on January 21, 2017, on the resignation of Acting Commissioner Carolyn Colvin[3], pursuant to the *Memorandum Providing an Order of Succession Within the Social Security Administration*, 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016) (herein "Succession Memo") issued by President Barack Obama on December 23, 2016.  That memorandum provided an order

---

[3] Colvin became the Acting Commissioner pursuant to the "first assistant rule" as she was confirmed by the Senate on December 22, 2010, for the position of Deputy Commissioner and was serving in that role on February 13, 2013, when Commissioner Michael Astrue's term in office expired.  *See*, Social Security Administration, Social Security Testimony Before Congress, *Testimony of Carolyn Colvin, Acting Commissioner Social Security Administration Regarding Oversight of Federal Disability Programs Before the Oversight and Government Reform Committee U.S. House of Representatives*; https:/ssa.gov/legislation/testimony_061114.html.  *See also*, March 6, 2018, GAO letter at 1.

of succession within the SSA that placed the Deputy Commissioner for Operations ("DCO") first in line to serve as Acting Commissioner should the positions of Commissioner and Deputy Commissioner both become vacant.[4] Thus, Berryhill became Acting Commissioner of Social Security on Carolyn Colvin's resignation.

On March 6, 2018, Thomas H. Armstrong, General Counsel for the Government Accounting Office ("GAO"), a non-partisan agency tasked with assuring that the executive branch is operating in compliance with congressional statutes, advised both the SSA and then-President Trump's Administration that Berryhill's term should have ended on November 17, 2017.[5] Following receipt of the GAO's letter, Berryhill stepped down as Acting Commissioner and once again assumed her title of Deputy Commissioner for Operations. On April 2, 2018, she signed an announcement for the federal register under the title "Nancy Berryhill, Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner."[6] *See also* Anne Joseph O'Connell, *Actings*, 120 Colum. L. Rev. 613, 634 (2020). On April 17, 2018, President Trump nominated Andrew Saul for the position of Commissioner of Social Security.[7]

---

[4] On January 21, 2017, Berryhill was serving as the Deputy Commissioner for Operations. *See*, Social Security Administration, *Social Security History, SSA Commissioners, Nancy A. Berryhill;* https://ssa.gov/history/Berryhill.html.

[5] *See,* Government Accounting Office*, Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998, Commissioner, Social Security Administration;* https://www.gao.gov/assets/700/690502.pdf.

[6] *Extension of Expiration Dates for Two Body System Listings,* 83 Fed. Reg. 13862 (Apr. 2, 2018).

[7] UPN1849 – *Nomination of Andrew M. Saul for Social Security Administration*, 115th Cong. (2017-2018) 115th Cong. (2019); https://www.congress.gov/nomination/115th-congress/1849?r=9.

After the submission of Saul's nomination on April 17, 2018, Berryhill assumed the title of Acting Commissioner of Social Security for the second time.[8]

On June 21, 2018, the Supreme Court held that ALJs of the Securities and Exchange Commission are inferior "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. *See Lucia v. S.E.C.* 138 S. Ct. 2044, 2049 (2018).

On July 16, 2018, "[t]o address any Appointments Clause questions involving Social Security claims, and consistent with guidance from the Department of Justice . . . the Acting Commissioner of Social Security [Nancy Berryhill] ratified the appointments of [the Agency's] ALJs and approved those appointments as her own." Social Security Ruling 19-1p, Titles II and XVI: *Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) On Cases Pending at the Appeals Council,* 84 Fed. Reg. 9582-02 (Mar. 15, 2019) ("SSR 19-1").

Plaintiff urges the court to rely upon the district court decision *Brian T.D.* which held that the FVRA lacked a "springback" provision which would allow Berryhill to resume service upon the nomination of Andrew Saul as Commissioner of Social Security. Plaintiff's Brief at 12-24.

The Commissioner counter-argues that the *Brian T.D.* decision is an outlier which conflicts with the plain language of the FVRA. *See* Commissioner's Brief at 13-24. Specifically, the Commissioner argues that 5 U.S.C. § 3346(a) provides a single trigger for service as an acting officer during the pendency of a first or second nomination. *Id.* at 15.

---

[8] On May 14, 2018, Berryhill signed an announcement in the Federal Register as "Nancy Berryhill, Acting Commissioner of Social Security." *See*, *Rescission of Social Security Ruling 05-02; Titles II and XVI: Determination of Substantial Gainful Activity if Substantial Work Activity Is Discontinued or Reduced-Unsuccessful Work Attempt*. 83 Fed. Reg. 22308 (May 14, 2018).

2. ***The Plain Language of 5 U.S.C. § 3346 and its Legislative History Support the Interpretation That a Springback Provision Enabled Berryhill's Second Term as Acting Commissioner.***

***i. The plain language of the act does not support a conclusion that an individual must have been serving at the time of nomination in order to assume service pursuant to 5 U.S.C. § 3346 (a)(2).***

This district has rejected the interpretation set forth in *Brian T.D*. *See Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022); *Neith v. Kijakazi*, No. 21-cv-2044-LRR-MAR.

In *Brian T.D.*, the court placed a significant emphasis on the word "serving" in its present tense. The court reasoned:

> Courts have frequently looked to Congress' choice of verb tense to interpret statutes. *Carr v. U.S.*, 560 U.S. 438, 447 (2010). When a Court is determining the meaning of an Act of Congress, the present tense generally does not include the past. *Id.* (citing the Dictionary Act, 1 U.S.C. § 1). Congress, in enacting § 3346, used the present participle "serving," rather than the past or present perfect "served" or "has served." Section 3346(a) applies to "the person serving as an acting officer" under § 3345. By its terms, then, the section applies to the person presently serving in that capacity and not to a person who had previously served as Acting Commissioner.

*Brian T. D. v. Kijakazi*, 580 F. Supp. 3d 615, 626 (D. Minn. 2022).

The court disagrees that the language of 5 U.S.C. § 3346 states an individual must already be serving as acting officer on the date that a nomination is made in order to *continue* to properly serve in that role. Such an interpretation reads additional language into the text of the statute. The court finds that the text present in 5 U.S.C. § 3346 cross-references to 5 U.S.C. § 3345 and that it is 5 U.S.C. § 3345 of the FVRA that provides which individual "may serve." Thus, the language at 5 U.S.C. § 3346 is in the present tense, not because it serves as a limitation, but because it relates to the individual next designated to serve pursuant to the applicable section, Section 3345 of the FVRA. Moreover, the actual text of the statute does not mention any requirement that a

nomination be submitted within the initial 210-day period. The statute simply says that "*once* a first or second nomination . . . is submitted," the acting official designated under the FVRA may serve "for the period that the nomination is pending." 5 U.S.C. § 3346 (emphasis added).

The court is not alone in its rejection of the statutory interpretation in *Brian T.D.* As noted, four districts have issued similar rulings. In the Middle District of North Carolina, a district court noted "[c]omparison of the language of subsection (b)(1) with that of subsection (b)(2), however, makes clear that the word "serving" does not possess the talismanic significance the *Brian T.D.* court would like to assign it." *Brooks v. Kijakazi*, No. 1:21CV609, 2022 WL 2834345 at *18 (M.D.N.C. July 20, 2022). In that decision, the district court found that the decision in *Brian T.D.* glossed over the fact that interpreting the time limits of 5 U.S.C. § 3346(a)(1) to apply only those who had already served would render a nonsensical result, as it would make it impossible for anyone to serve. *Id.* at 18.

In *Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022) this district joined with the *Brooks* decision in declining to follow the statutory interpretation of *Brian T.D* that 5 U.S.C. § 3346(a) applied only to an individual already serving. In *Bauer*, the district court reasoned, as had *Brooks*, 2022 WL 2834345, that the court in *Brian T.D.* erred in its interpretation of the word "serving." The court reasoned in *Bauer*:

> Subsection (a) refers to "the person serving as an acting officer as described under section 3345." Thus, "serving" is used to refer back to section 3345, which sets out who may serve as an acting officer (first assistants or certain other people directed by the President). While § 3345 provides who may serve as an acting officer, § 3346 sets the periods of time during which such persons may serve in that role. Significantly, the active verb in § 3346(a) is not serving, but "may serve": "the person . . . may serve" subject to the time limits set out in subsections (a)(1) and (a)(2). By using "may serve," Congress did not convey that the person had to be currently serving for the

26

> nomination rule in subsection (a)(2) to apply ("the person . . . may serve . . . once a . . . nomination . . . is submitted . . . from the date of such nomination for the period that the nomination is pending").

*Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917, at *5 (N.D. Iowa July 25, 2022).

The district court in the Eastern District of Virginia similarly declined to follow the interpretation of *Brian T.D.*, stating:

> *Brian T.D.* misreads the import of section 3346(a)'s prefatory language. The Magistrate Judge placed great weight on the present participle "serving," finding that "the section applies to the person presently serving in that capacity and not to the person who had previously served as Acting Commissioner." [*Brian T. D.*, 580 F. Supp. 3d at 626]. But the word "presently" does not appear in the full provision, which refers to "the person serving as an acting officer as described under section 3345 . . . ." 5 U.S.C. § 3346(a) (emphasis added). A court "should give effect … to every word that Congress has used in a statute." *Conn. Dept. of Income Maint. v. Heckler*, 471 U.S. 524, 530 n.15 (1985) (citing *Reiter v. Sonotone Corp.* 442 U.S. 330, 339 (1979). When this qualifying clause is properly considered, the prefatory language has nothing to do with a period of "present service." Instead, it constrains section 3346(a)'s scope to individuals whose authority stems from the FVRA.

*Lance M. v. Kijakazi*, No. 2:21-CV-628, 2022 WL 3009122, at *13 (E.D. Va. July 13, 2022), *report and recommendation adopted,* No. 2:21CV628, 2022 WL 3007588 (E.D. Va. July 28, 2022).

The court finds the interpretation herein is further supported by the language at 5 U.S.C. § 3346(b). At 5 U.S.C. § 3346(a)(2) there is no language indicating that an individual serving might "continue" service, nor is there a cross reference to 5 U.S.C. § 3346 (b)(1) or (B)(2) regarding such. There is no stated or implied limitation on service to one already holding office as an acting officer. In contrast, 5 U.S.C. § 3346 (b)(1) states that if a nomination is rejected, withdrawn, or returned, "the person may *continue to serve* as the acting officer for no more than 210 days." 5 U.S.C. § 3346(b)(1) (emphasis added). Subsection (b)(2) also states that if a second nomination is

unsuccessful, "the person *serving* as the acting officer may *continue to serve*." 5 U.S.C. § 3346(b)(2).

To interpret 5 U.S.C. § 3346(a)(2) as Plaintiff suggests would be to find that Section 3346(a)(2) provides that no person may serve pursuant to the submission of a nomination unless they were "continuing service." The court agrees with *Bauer*, that the language "continue to serve" at Subsection (b)(1) and (b)(2) reinforces the conclusion that the interpretation in *Brian T.D.* is flawed. *See Bauer,* 2022 WL 2918917 at *6. The language of 5 U.S.C. §§ 3346(b)(1) and 3346(b)(2) is specific that if a nomination fails, the person currently serving as acting officer "may continue to serve." The language at 5 U.S.C. §§ 3346(b)(1) and 3346(b)(2) is specific, deliberate, and unambiguous, and makes clear that it restricts the office to one already serving. In stark contrast, 5 U.S.C. § 3346(a)(2) contains no such language and at no point indicates that such service is deemed a "continuing" service.

If the court were to interpret 5 U.S.C. §§ 3346(a)(2) as Plaintiff requests, doing so would not only add language to the text but would compound that error by including language which, in this context, appears to have been intentionally omitted. The court declines to do so.

### ii. The plain language of the Act does not support a conclusion that the word "or" at 5 U.S.C. § 3346(a) serves as a disjunctive which renders an individual not already serving as acting officer to assume office on submission of a nomination to the Senate ineligible to do so.

In *Brian T.D.*, the court further based its interpretation that 5 U.S.C. § 3346(a) precluded Berryhill from assuming a second term in office upon the submission of Andrew Saul's nomination on the following analysis of the meaning of the word "or":

> The word "or" modifies the entire provision that limits the acting officer to a period "no longer than" 210 days from the date the vacancy arose. Thus, when read with the entirety of subsection (a)(1) "or" serves to suspend that time limitation, not to create an entirely separate and distinct period of service. A person serving as an acting officer may do so "for no longer than 210 days beginning on the date the vacancy occurs; or . . . once a first or second nomination for the office is submitted to the Senate," during the

pendency of that nomination. *Id*. § 3346(a) (emphasis added). The ordinary usage of the word "or" is disjunctive, indicating an alternative. *United States v. Smith*, 35 F.3d 344, 346 (8th Cir. 1994).

*Brian T.D.* 580 F. Supp. 3d 615.

The court finds that the interpretation of the word "or" at 5 U.S.C. § 3346(a) in *Brian T.D.*, making the two alternatives mutually exclusive, is mistaken. The FVRA provides:

> **(a)** Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—
>
> **(1)** for no longer than 210 days beginning on the date the vacancy occurs; *or*
>
> **(2)** subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

5 U.S.C. § 3346 (emphasis added).

The court also finds that the court in *Brian T.D.* erred in its reliance on *Smith*. *Smith* is easily distinguished from *Brian T.D.* and the case at bar. In *Smith*, the Eighth Circuit considered the language of a statute which barred prosecution for perjury unless "the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed." *Smith*, 35 F.3d at 346. The Eighth Circuit ruled that it was error to require an individual to prove both factors and that the word "or" in that context indicated that the two factors were alternatives but not that they were mutually exclusive. *Id*. Specifically, the Eighth Circuit ruled that Smith should prevail if he proved the existence of either factor. *Id*.

The *Brian T.D.* court erred in relying on *Smith* to support its interpretation that the word "or" was exclusive rather than inclusive. The Eighth Circuit in the *Smith* ruling found merely that the word "or" was disjunctive. The plain language of the word "or" is defined by Miriam Webster Dictionary as that of a conjunction, "used as a function

Case 6:22-cv-02017-LRR-MAR   Document 20   Filed 01/17/23   Page 29 of 34

word to indicate an alternative."[9]  The dictionary further provides that the archaic version of the word is "either."  *Id*.  Thus, as noted, it is possible for the word to be both inclusive and exclusive.

That the Eighth Circuit found "or" was used as a disjunctive in *Smith* resolved whether a declaration *must* fulfill both factors to allow a prosecution but not whether a declaration *may* satisfy both factors.  *Smith*, 35 F.3d at 346.  Whether both factors need apply hinges on whether the word is inclusive or exclusive—not on whether the word is conjunctive or disjunctive.  If "or" is inclusive, then both choices may apply, but if it is exclusive only one choice could apply.  *Smith* makes no determination whether the word "or" is inclusive or exclusive, as that finding was irrelevant to the issue before the Eighth Circuit.  *See id*.  Additionally, the court finds that such a determination can only be made on a case-by-case basis, as such meaning would differ depending upon the context in which the word was used.

> Here, the word 'or' appears in a permissive sentence, i.e., 'the person serving as an acting officer as described under section 3345 *may serve* in the office,' 5 U.S.C.  § 3346(a) (emphasis added), without qualifiers such as 'either' and 'but not both,' *see id*.  Accordingly, the court should interpret the word 'or' in Section 3346(a)(1) in its more common, inclusive sense to permit Berryhill, after serving as Acting Commissioner for 300 days following the vacancy under Section 3346(a)(1), to spring back into that role upon Saul's nomination to the Senate under Section 3346(a)(2).  *See N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 939, (2017).

*Brooks v. Kijakazi*,  2022 WL 2834345.

In *Bauer*, this district considered the statute's use of the word "or" contextually, finding that:

> According to *Brian T.D.* and *Richard J.M.*, the Deputy Commissioner's initial 100 days of acting service did not occur under subsection (a)(1), and now the length of service is governed by subsection (a)(2); but if the nomination had occurred on the 211th day of acting service, the time limits

---

[9] Miriam Webster Dictionary (11th ed.).  Retrieved from https://www.meriam-webster.com/dictionary/or.

in subsection (a)(1) would have already elapsed, and thus, subsection (a)(2) cannot apply. I find this reading incongruous with the statutory text, which sets out when an officer "may serve," not when that service must end. In the example, the better reading is that the Deputy Commissioner served as the Acting Commissioner under subsection (a)(1) during the initial 100 days, and the Deputy Commissioner served as the Acting Commissioner under subsection (a)(2) during the pendency of the nomination. Thus, the statute's use of "or" does not demonstrate that subsections (a)(1) and (a)(2) are mutually exclusive.

*Bauer*, 2022 WL 2918917, at *13.

The court finds that the language of 5 U.S.C. § 3346(a) is best interpreted to provide that once a nomination has been made for a permanent PAS officer, the appointment of the individual designated by 5 U.S.C. § 3345 has been triggered regardless of whether there is an acting officer already serving on the date the nomination was submitted.

Despite the court's finding that the plain language of the FVRA supports the statutory interpretation contained herein, in an abundance of caution the court will engage in the additional step of reviewing the legislative history of the FVRA as well, to determine whether it also supports the court's statutory interpretation.

### 3. The Second Canon of Statutory Interpretation: Following the Legislative Intent

A Senate Report ('the Report") accompanied the bill. The Report stated that if the initial time limitation triggered by the vacancy passed, an alternate period of service would be triggered upon the submission of a nomination. *See* S. REP. 105-250, 14 (1998). The Report provided that during the period between expiration of the initial term in office and the submission of nomination the office would remain vacant. *Id*. at 18. Significantly, the proposed language of Section 3346(a)(2) of the FVRA, which accompanied the Report, was identical to the language ultimately adopted and is also identical to the language considered herein. *Id*. at 25. Although legislative intent is determined by interpretation of the text, the intent here was explicitly stated in the Report.

As such, the legislative intent was that 5 U.S.C. § 3346(a)(2) would provide an additional period of service upon submission of a nomination even if the initial 210-day term had expired.

In her reply brief, Plaintiff argues that the legislative history is unclear. Specifically, Plaintiff cites to language in *N.L.R.B.*, 137 S. Ct. at 942–943, which addressed conflicting floor statements by Senator Fred Thompson and Senator Robert Byrd, arguing that the statements thus show that legislative history arguments are misguided. *See* Reply Brief at 8-9. Plaintiff errs by taking that language out of context. In *N.L.R.B.,* the court was not addressing the issue at hand and was, instead, addressing an issue in which conflicting floor statements had been made. In the case at bar, no such conflicting statements were made. Given that the statements of both Senator Thompson and Senator Byrd were that the bill contained a "springback provision" the court disagrees with Plaintiff that the statutory history is unclear and that only a plaintext interpretation of the FVRA would be appropriate. *See*, *N..L.R.B.*, 137 S. Ct. at 943 (quoting *Milner v. Department of Navy,* 131 S.Ct. 1259 (2011)) ("Those of us who make use of legislative history believe that clear evidence of congressional intent may illuminate ambiguous text.")

The court thereby finds that the legislative history of the Act also supports the statutory interpretation rendered herein. Thus, the court finds that pursuant to 5 U.S.C. § 3346(a)(2), an additional term of service as Acting Commissioner of Social Security was created upon the submission of the nomination of Andrew Saul to that office and that the person designated by the Succession Memorandum to serve pursuant to 5 U.S.C. § 3345 was able to serve as Acting Commissioner.

### 4. *Application of Fact and Law*

Having determined that 5 U.S.C. §§ 3345 and 3346 provided that upon the nomination of Andrew Saul on April 17, 2018, the next individual in order of succession would automatically assume the role of Acting Commissioner unless the president

designated another individual to the role, the court must then determine whether Nancy Berryhill was the person next in line of succession.[10]  The court finds that because Nancy Berryhill stepped down from her position as Acting Commissioner of Social Security at least on or before April 2, 2018, following the GAO's March 6, 2018, letter, and was properly serving as the DCO on April 17, 2018 (the date of Andrew Saul's nomination), she was the next person in order of succession pursuant to the Succession Memorandum.[11]  Berryhill's second term as Acting Commissioner of Social Security was not in violation of the FVRA and properly commenced on April 17, 2018.  Thus, the court finds that Berryhill's July 16, 2018, ratification of ALJ appointments was performed on Berryhill's ninetieth day in office during her second term as Acting Commissioner of Social Security and carried the full force of law.  Accordingly, the court will not remand as to this issue.

### VII.   CONCLUSION

In light of the foregoing, it is hereby **ORDERED**:

(1)     The final decision of the Commissioner of Social Security is **AFFIRMED**; and

(2)     The Complaint (docket no. 3) is **DISMISSED WITH PREJUDICE**; and

(3)     The Clerk of the Court is **DIRECTED** to enter judgment accordingly and close this case.

---

[10] No evidence has been introduced nor has any party alleged that at the time Andrew Saul's nomination was submitted to the Senate, then-President Trump appointed another individual to serve as Acting Commissioner of Social Security or made any change to the terms of the Succession Memorandum then in place.

[11] Berryhill was not the first Deputy Commissioner of Operations to serve as Acting Commissioner pursuant to a succession memorandum.  From January 20, 2007, through February 11, 2007, DCO Linda S. McMahon served as Acting Commissioner pursuant to a succession memorandum.  *Social Security History, SSA Commissioners, Linda S. McMahon*.  www.ssa.gov/history/mcmahon.html.

**DATED** this 17th day of January, 2023.

LINDA R. READE, JUDGE
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA